The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning everybody, please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. We have three cases on for argument this morning. The first case is 24-2161 Cherry Grove Beach Gear, LLC v. City of North Myrtle Beach. Mr. Moss, whenever you're ready. Good morning and thank you. Please the Court. I wanted to briefly summarize the way that we've outlined our arguments. I want to touch on the market participation exception to state action immunity and invite the Fourth Circuit to adopt that doctrine. I know that it was first suggested by the Supreme Court in dicta, but some of the circuits have adopted it, notably the 11th Circuit. I then want to look at the analysis of the lower court in the state action immunity issue and suggest to the Court why we believe the analysis was flawed and should be revisited. And then finally, I want to touch on some of the other claims that were brought in the lower court on the contract clause claim and the taking claim under the Fifth Amendment because we believe that the Court's analysis under the state action immunity, having been flawed, that the analysis applied to the taking claim and the contract claim was not proper. And we believe that they have to be revisited in light of the corrected legal doctrine. And so let's talk for a moment about market participant exception to state action immunity. The purpose of state action immunity was clearly set forth in that 1940 opinion in Parker v. Brown, and the doctrine is grounded in principles of federalism and it was designed to respect the states and their governmental capacity as sovereign regulators. It was all about regulation. Nothing in that 1940 opinion had anything to do with market participation. Indeed, it was clear from the opinion that it was all regulation. Market participant conduct, though, in other words, engaging in private enterprise by a governmental entity, is not an integral part of traditional governmental functions. This conduct, this market participant conduct, does not fall within traditional Parker v. Brown state action immunity principles. Tell me about, what about Western Star, this circuit's opinion in the Western Star case in 2021? Why should we recognize the market participant exception here when we did not, we refused to do so in the Western Star case in 2021? Well, in Western Star, respectfully, I think the Court got it exactly right, and the Virginia state statutes specifically authorized the conduct that was being undertaken and the anti-competitive nature of the conduct. In Western Star, right here in Richmond, the franchise agreements were, state regulatory statute allowed the prohibition of operation of EMS vehicles in the jurisdiction without a permit. They permitted the jurisdiction to limit the number of permits issued for ambulances in the jurisdiction, and they also allowed the jurisdiction to set the fees that ambulances would charge. Those are very specific and clear articulation of the state policy to displace competition in that business. So you don't, so it's your position that under the South Carolina Code 57145, it is not specific enough? That's absolutely my position. I think that, I think any reading of 57145, and they tell us the best indication of what a legislature intended is what statute says. And in 57145, there is the word. Section three, what about section three? Under 571453? Let me grab my copy. Under section three, it clearly says, well, section three is not the starting place of the analysis, but under section three, it does state the municipality may grant an exclusive right to the beach safety company to rent only the beach equipment and to sell only the items to the public on the beach that are allowed, but you can't start the analysis with section three. You have to start the analysis with section one under section B of 57145. And it says, if the municipality contracts with a private beach safety company, and they follow the lawful procurement policies either by the state or under city procurement code, and they grant a contract to a private beach safety company to provide those public safety services, lifeguards, then, in that instance, they can grant an exclusive franchise to the private beach safety company. Nothing about that analysis includes the jurisdiction itself engaging in the monopolistic conduct. There's two roads they can take under 57145. They can provide those lifeguards, and they can implement public safety regulations and enforce them. They can provide the lifeguards to the city staff, or they can hire a private beach safety company. 57145.  Sorry? I'm sorry to interrupt you. This is Judge Diaz here. A couple of questions for you. First, back to your principal point about market participation, just so that I understand what your position is, you're not suggesting that there's a blanket prohibition on jurisdictions engaging in what would otherwise be proprietary market functions, but if I understood you correctly, you're saying that that authority has to be explicit before that activity can be undertaken. Do I have that right? Yes, you do, Judge. As a matter of fact... Okay. So, if we were to disagree with you, that the statutes were, in fact, explicit enough, you would lose. I understand that's not your position, but if you think the statutes are sufficiently explicit to grant authority to the municipalities to do this very act of engaging in beach activities with regard to lifeguards and chairs and the like, then you would lose on appeal. At least in this court, that is correct. Okay. Well, I guess there is another court, but okay. But our position clearly is that the monopoly legislated by North Myrtle Beach in 2022 is most certainly not the inherent, logical, or ordinary result of the exercise of authority granted in 57145. Okay. Now, with respect to these statutes, why isn't it reasonable to read it, I think, as the District Court did, as indicating a choice for the municipality and the state? That is, if the state or municipality, in this instance, chooses to grant a franchise, it may do so exclusively. But I don't... Why is it that you're reading the statute to suggest a single proposition? Why isn't it either or? The state or municipality can grant a franchise if it chooses to do so, but if it doesn't, it can itself engage in this activity. Why isn't that a reasonable reading of the statute? Well, in all due respect, I don't think it's a reasonable reading of the statute because the case law from the United States Supreme Court dictates otherwise. And if you look at the Town of Howley versus the City of Eau Claire case, it's clear that the expressed words don't have to be included in the statute. You have to have a finding that there's some inherent, logical, or ordinary result of the exercise of authority delegated in the statute. We know that from the Town of Howley case. But fast forward to 2013 and look at what happened in the Phoebe Putney case. That was a unanimous decision of the United States Supreme Court. In that decision, there was an express empowerment of those counties and municipalities to create hospital authorities. And there were 27 specific delegated authorities those authorities were given. And some of those authorities included the right to purchase land and to purchase hospitals and to purchase, they called them projects, but projects were defined to include hospitals and medical facilities, okay? So we had an express authorization in the statute that you can do these things. This is authority. But when challenged, the Supreme Court of the United States determined that's not enough. That's not enough to pass the clear articulation test. In that court, they determined that a general grant of authority was not enough. You have to have an explicit grant to compete in anti-competitive ways. In the Phoebe Putney case, it was Justice Sotomayor's opinion, she actually stated in the opinion that you have to exercise your authority against the backdrop of federal antitrust laws. Now, in the lower court's opinion here, the lower court said that it was going to refuse to impose atextual limitations upon the city of North Portage Beach's power under 57145. But that's disregarding and disrespectful of the Supreme Court's Phoebe Putney opinion because I suggest to you that the backdrop of federal antitrust laws, as Justice Sotomayor wrote, the general powers have to be wielded in respect of the backdrop of the federal antitrust laws. That backdrop of federal antitrust laws is the imposition of atextual limitations upon the city of North Portage Beach's power under 57145. But, Mr. Moss, under your view of things, it would be perfectly fine for the municipality here to grant a monopoly, essentially, to a market participant. That's the very antithesis of antitrust law, right? So why is it any different for a municipality to do the same thing? Well, this municipality is engaged in anti-competitive conduct. In fact, they had a 25% price increase in their- Right. But under your reading of the statute, they would be engaged in every bit of anti-competitive statute by granting exclusive franchise to one single purveyor of these services, right? They could grant, they absolutely could do that. They could grant the franchise to one purveyor so long as that purveyor was competitively compured, procured, for a duration of no more than seven years. When you allow- That would seem odd then. If, in fact, the statute were to read as you suggested, it would seem to require an affirmative statement. The state and or municipality may only proceed if it grants an exclusive franchise to one market participant. But it doesn't say that. And it doesn't say that it can, hence the lack of a clearly articulated state policy to displace competition in this marketplace. 57145 in the South Carolina Code has nothing to do whatsoever with beach equipment or delivery and setup of beach equipment. It has nothing to do. It has to do with providing of lifeguards and public safety services. And so it is a very expanded reading of 57145 to even include any notion that that allows them to set up beach chairs or beach umbrellas on the beach or to rent them. That is a- It is a- I submit to you that the difference given to municipalities and counties is being exploited by North Myrtle Beach in this area and it's done for profit. And it's exactly contradictory to the notions of the Parker Brown immunity, state action immunity, because this is not regulatory activity. This is proprietary activity for profit. And when you allow this to happen unchecked, you get municipalities engaging in proprietary functions for profit, perhaps to offset fiscal woes, perhaps for other purposes. But 57145- So you don't- So do you- But the services, the funding is going 100% to lifeguard services. Does that make a difference? Well, firstly, I don't think that's correct information. But secondly, it doesn't make a difference. My reading of the analysis in all of the cases in the Supreme Court and the Courts of Appeals, the financial motivation for it is irrelevant to the analysis. I suspect every proprietor of every monopoly would believe and assert that they have a need for the funds. I would suggest to you that this circuit could adopt its own version of the market participant analysis, where you would require a showing. We know that the municipality here has the burden of proving that they're acting according to state action.  That's- Our case law tells us that. They have that burden. But I would suggest to you, without something more specific by the state legislature, that market participants should not be granted that immunity. And we do get specifics by the legislature. It happened right here in Richmond in the Western Star opinion. That state statute specifically gave entitlement and empowerment to engage in anti-competitive activity exactly as they did. The court got it right in that opinion, as far as I'm concerned. In Phoebe Putnam, they got it right. Because in that situation, the town of Eau Claire was entitled and empowered to install sewer service to limit the geographical area they would serve and to refuse to serve non-residents or areas outside of their jurisdictional limits of their town. I think that was a correct opinion by the court. I know it was a correct opinion by the court. That's their guidance. Their guidance is, the enabling legislation allowed them to engage in that anti-competitive conduct in the field of providing public sewer. That did not happen. Mr. Moss, I'm sorry to interrupt again. I know you can't see and predict when I'm going to speak, and I apologize for that. Before you sit down, I think you've got half of the analysis here correct, but I think you need to help us with the other half. You say that the statutes have to express a clearly expressed policy allowing whatever activity is being regulated to occur. I think that's half right, because then the cases also say that the resulting policy enactments have to be reasonably foreseeable result, which is not clearly as onerous, I think, as clearly expressed, and the cases seem to suggest that it's a pretty low bar. So why isn't what the city has done here clearly foreseeable, a foreseeable result of the policy enacted by state regulators? In 57145, the city is empowered to provide lifeguards using its own staff and to provide public safety services. Nothing about that has anything to do with beach equipment. Nothing about that has to do with umbrellas and chairs. Maybe not. Not directly, but isn't that, I mean, isn't one way to do that, the way that this statute and regulation does it, by funding the cost of the lifeguards and providing, instead of providing an exclusive franchise, taking on that service itself to fund the regulatory aspects of the statute, which is clearly within the purview of the city, that is, to protect its citizens by hiring lifeguards. Certainly, that's what they're doing, but with all due respect, I haven't read one case of opinion in any circuit or the Supreme Court that suggested that the utilization of the funds for any particular purpose was part of the analysis. All right. All right. I'll ask my colleagues if they have any other, any additional questions before you sit down. Not right now. Okay. Thank you very much, sir. Thank you. We've got some time left for rebuttal. Mr. Dorn. Good morning. Thank you, Your Honor. My name is Albert Dorn. I'm here representing the city of North Myrtle Beach. My co-counsel, Kirsten Smalls, is with me. This case is important, not only to the city of North Myrtle Beach, but also to all South counties who govern, regulate, and protect South Carolina's beautiful beaches, which are a source of recreation for its citizens and tourists, but also it's the crown jewel of tourism for the state. While this case is important in that broad sense, as has been noted in the briefs and by questions this morning, this case really presents a narrow issue concerning the appellant's optional on-beach delivery and setup of beach gear on the beach in North Myrtle Beach and the city's regulation of the beach activities. Not a prohibition, not a city-wide ban that has been in place for years and one with which other beach gear businesses have complied. Importantly, this is not a case of some quasi-state entity that is infected and controlled by private interest or private actors. As has been noted this morning, the city is a political subdivision of the state. It performs critical lifeguard and beach safety services on its nine miles of beach. It does so with its own employees. It separately operates the beach gear function. This is important. There are no private actors, third parties, contractors, or participants involved at all. It's all done by the city. All of the- That's because there's no competition. That's always the result when you have a non-competitive type format like that. So that wouldn't be any surprise. You've covered it. The question is, have you correctly and appropriately done so? I know the result will be there's nobody else to be involved because you've made sure that because you've taken care of that, you've taken it on yourself. The issue here is whether or not you've appropriately done so. We talk about anti-competitive activity. That's something we're very careful about because the whole American spirit of enterprise and we do it in a private sector, that's kind of the basis of our sort of economic democracy, if you will. Right? Correct, John. So we have to be very careful in terms of we're going to just carte blanche, take proprietors and other competitive people in the private industry from this activity. So you're saying, could you do this without this statute? Just say, we're going to take care of these chairs and umbrellas. Could you do it without this or do you need this authority? We're trying to understand what your powers are. Don't you need this statute to do it? Yes, sir. You need that, right? So then we have to read this as such that it permits it. That's correct. And you would concede that it does not specifically talk about the county undertaking this itself. It seems like more ink is used in terms of how you would competitively sort of bid this thing and one person would be allowed the monopoly or one entity if they're successful. Am I right or wrong about that? You tell me. If the statute were exercised by the city to farm out, so to speak, the services, beach lifeguard services, the statutes about lifeguards to a third party, then that third party would be able to use those powers to also rent beach gear and things on the beach. But the key is the two statutes are tied together, 5730 is, in general, a home rule statute. But it was amended in 1999 and Judge Dawson, in a very well-reasoned order, analyzed all of that and tied together the passage of the section in 5730 that says it gave municipalities the right to grant franchises and make charges for the use of public beaches along with the passage of 57145. That's a very key fact and legal point for our case. Those two statutes were amended in the same act. And that act, as your honor has recognized, 57145, allows the city to provide lifeguard and other safety related services on and along the public beaches and to enact and enforce regulations it determines necessary for the safety of all persons on the beach. While our argument is on this is an authorized, a clearly contemplated activity, because as Judge Diaz mentioned, the statute specifically talks about renting beach gear. It links together the lifeguard duties with the beach gear rentals because it pays for it. And this is not, as Mr. Moss said, I respect him, we've been in this case three years, we have other cases, this is not a profit enterprise, as he said. The city pays a lot of money for 100 lifeguards up and down the nine miles of beach for beach patrol, for beach sanitation, and this beach gear rental helps, it goes 100% to pay for the lifeguards, and then it supplements. Mr. Dorn, sorry to interrupt you, can I ask you two questions related to that. Is that dispositive here, if, for example, the monies that the city got from the rental of beach chairs and umbrellas went somewhere else, to education or some other part, police force services, would that change the result? Well, I'm not sure in the abstract, but I do think that it's important to show that the activity of the city is in the contemplation of the statutory scheme. In other words, the statutory scheme that was passed in 1999 contemplated that beach gear rentals would be used to fund lifeguards, which is very expensive. Yeah, but isn't it, I thought you had made a separate argument in your briefs, and maybe I'm just imagining it, that there's also a safety component to this beach gear rental because of umbrellas flying all over the place and posing a danger to others on the beach. Is that right? That's correct, your honor. So it seems to me that you could do this, again, I don't want to put words in your mouth, that this is a separate regulatory issue that you could handle, irrespective of whether or not those funds went to lifeguard services. That's correct, your honor. And we fully briefed that point, and that is a secondary position, is that standing alone, the city has authority under 5-7-145A to, quote, enact and enforce regulations it determines necessary for the safety of all persons on the beach, end quote. And this use of the heavy-duty gear, the monitoring of the gear, we have attendants that are out there on the beach, whereas the appellants, they drop stuff off in the morning and they don't come back until they pick it up in the afternoon, unless there's a storm that blows up or something. But for the most part, they leave the scene. We stay on the scene. Our 100-plus, the lifeguards are there, but also the beach rental employees are there. So let me ask you about, sorry, again, just raise an interesting point. So Mr. Mussel's clients are not completely barred from providing services on the beach, they just can't do the on-beach installation of chairs and umbrellas, which, you know, that's not an insignificant handicap because, obviously, people are more likely, it seemed to me, I know I would prefer to have somebody put the umbrella down and have to do it myself. But I suppose, in theory, you could just completely bar them from engaging in the service at all because the city could say this is just too much of a safety hazard for the reasons you just expressed. And again, I'm not putting words in your mouth, but tell me if you agree with that. Could you just completely say, we're not going to let them do any of this work? Absolutely. Not only could we bar that activity, but we could absolutely bar all commercial activity. And other beaches in South Carolina do that. Sullivan's Island, for example, bars all commercial activity. That authority is within the province of the municipality under the South Carolina statutes and constitution. So you can only buy a state hot dog. Well, I mean, that's what you're saying, all commercial, right? All the condiments and everything's got to be ketchup certified by the state. Are you saying that you just take over the whole thing, right? Well, you know, for those familiar with South Carolina beaches, there is no commercial presence on the beach. And that's an important factor of tourism and of the industry and that we want to keep our beaches free of that. We don't want it looking like the... And that's what it really is, right? You really want to control the atmosphere of the beach at writ large, really, don't you? Don't you? That is one part of it, Your Honor. That's a big part of it, isn't it? Well, the other part of it is that we need to pay for lifeguards and lifeguards are expensive and it's an important safety function. And there were three drownings on the Grand Strand that I know of this summer that, you know, the rip currents and things like that. I don't think any convincing about it that lifeguards are important and essential to beaches. I don't think so at all. I don't think that's the issue. The question in terms of Chief Justice Diaz talking about the question you talked about the funding, perhaps it gave you maybe some good, I wouldn't say it's advice, but a query for you to think about. You said it's secondary, but perhaps it's the primary one is the safety aspect because you're linking, it says for safety type things, a lifeguard, and you're linking it because well, the beach umbrellas are important because they fund this activity. You could do that with a lot of things. Off the beach, you could say, well, you know, it's for lifeguards, but we're going to take a monopoly on this aspect too and link it because we use the funds from that activity to have lifeguards. You know, a lot of elasticity, I talked about using funding to connect it, but this is not a safety issue, but it is going to fund something that is a safety issue on the beach, and therefore we can be anti-competitive. Your Honor, I would respond to that by saying that it's possible for us to do anything, but we're doing something that is specifically contemplated by the statutory scheme. That is renting beach gear that is linked together with the provision of lifeguard services. We wouldn't do something that wasn't authorized by the statutes, and, you know, it's... Well, we don't know. That's for us to decide whether or not it is. That's the legal question, isn't it? Your Honor... That's why we're here for... We're not selling... Excuse me. We're not selling... Excuse me. That's why we're here today for legal determination, isn't it? You said we can do anything, right? That's correct. Right? That's correct. Okay. Go ahead. That's correct, Your Honor. We're not selling hot dogs. We're not selling hamburgers. We're not selling jewelry. We're not selling short necklaces. No, you're selling... You're taking care of the umbrella industry and chairs. That's what you're doing. The deck chairs. We're renting chairs as contemplated by the statutory scheme. And this is something that, as noted earlier, the authorities in Western Star and in Phoebe Putney and in Boulder, City of Boulder, say that the state policy to displace competition with regulation obviously needs to be clearly articulated and affirmatively expressed. But specific authorization to engage in the anti-competitive conduct is not required. So technically, it's not required that it be spelled out that we can rent beach gear. But it is. So we're even a step ahead of that because 57145 does spell it out. It's sufficient that anti-competitive activity is the foreseeable result of the state policy. So the statute itself doesn't have to say that the city can rent the beach gear. If the scheme, the statutory scheme, that is the part that was passed in the same act in 1999 in 5730 to grant franchises and make charges on the public beach, is with 57145 states anti-competitive activity, then we are entitled to state action immunity. That is our position, your honor. And the authority to grant a franchise is inherently the power to displace competition. So the statute gives us the right to franchise out lifeguarding and- So Mr. Doran, again, sorry to interrupt, but that does make sense. But I suppose the reasonable corollary to that is if you don't grant a franchise, then the market then takes over and participants are then able to engage in this commercial activity. There's nothing in the statute that expressly says that the alternative is for the state to do that. That's what Mr. Moss's position is. Let's talk about what Mr. Moss wants. Under the statute, you know, one thing that's always puzzled me in this case is if there is a ban on, say that the city decides we don't want lifeguards, that's perfectly within their purview. We're not going to pay for lifeguards. There's plenty of beaches up and down the coast. Pawleys Island, where I live, doesn't have lifeguards. Like I said, there were drownings this year. But just say that we have a complete ban on any commercial activity, like Sullivan's Island, then the appellants would not be able to operate on the beach. If a franchise were allowed for the lifeguard business, like it used to be in the old days, then they don't have, when I say they, the appellants don't have any lifeguard capability. They just want to rent the beach gear and get the money, but they don't want to provide any safety services along with it, like providing for lifeguards. So if it were to be franchised, these appellants would not get that franchise because they don't do lifeguard operations. And if the city franchises the lifeguard function to a third party, it's the same effect on the appellants. Well, I think Mr. Moss would say they don't do it now, but they might. They could be allowed to do it. That's not so easy. Running rental gear out of your garage is not so easy as staffing nine miles of beach with a hundred lifeguards, and training them properly, and the city of North Myrtle Beach is the only USLA, United States Lifeguard Association, certified lifeguard crew on the Grand Strand, in fact, on the South Carolina beaches, because it avoids the dual role. These franchises, what they would do is they would have sometimes the lifeguards renting the beach gear, and they would be doing what's called a dual role, trying to watch the ocean and trying to rent beach gear. The city does not do that. We have separate employees serve as lifeguards, separate ones renting the beach gear, so that there's not some dual role where it takes or distracts from the lifeguards. There was a huge case. You could have a third set of employees selling state hot dogs, I suppose, too, right? I don't see that in 57145. It could be, but I'm not here to advocate for that. I'm not here to advocate for unlimited authority of the city, and if my comments have been construed to infer that, that is not the intention. The intention is to show the court, as Judge Dawson, that was a carefully crafted order on his part. I do give him credit for an exhaustive, detailed order, and he tied together the authorities between the two statutes as part of the same statutory scheme, and frankly, I really can't enunciate it any better than that. It is a well-reasoned order, and as far as this market participant concept, it has not been adopted by the Fourth Circuit, as Judge Benjamin said. This court, four years ago, rejected it, called it a novel theory, and did not apply it. This case falls within the parameters of Western Star. Think of the non-emergency medical transport, along with the emergency transport that was involved in Richmond. The non-medical transport is basically shuttling patients to doctor's offices. It's like a glorified Uber. That is a very lucrative part of that contract, and that's what the Fourth Circuit allowed in Western Star, was it upheld the statute that said that you can also provide the lucrative non-medical transport, shuttling people or patients to doctor's appointments, but you must also perform the life-saving emergency medical services, just like here, where the city performs and pays for some $4 million, or $3 to $4 million, in lifeguard functions and beach patrol functions and beach cleanup. It also, to underwrite or to help defray the cost of that, sells the beach gear on the beach. Nobody has to buy it. Nobody has to sell it. I mean, nobody has to rent it. They can bring, you can bring your own gear to the beach. Mr. Moss's client, Cherry Grove Beach Services, can do like the other three competitors. They've been doing it for years. They bring it to the condominiums. They bring it to the end of the beach street. They bring it to wherever they can meet the renter, but they don't set it up and deliver it on the beach and leave it. Thank you. Thank you, Mr. Doran. Mr. Moss, you've got some rebuttal time. Thank you. In further response to the question that I got from you, Judge Benjamin, about Subsection 3 of 57145, I would ask you to note that the language of the statute under Subsection B clearly says, if the municipality elects to provide these services by agreement with the Subsection 3, it's one of those conditions that applies in the private safety company. That's expressed in the statute. I want to suggest to you that we do not quarrel with the city's authority to impose public safety rules and regulations. That's the regulation protected by the Parker Immunity Doctrine, but that's not what's happening here. There's not a single regulation about the type of anchor you can use to anchor an umbrella in the sand. There's not a single regulation about the size of an umbrella. There's not a single regulation about the size or type of a chair that's being used or the weight of a chair. These are all things that could be implemented, but they're not. I suggest to you that this is, the suggestion that this is about public safety is trying to sway the court's deference to the municipality for public safety. It's not in play here. There was a misstatement earlier about all of these funds being used to fund lifeguards. That is a factual misstatement in this record. In fact, our record, our discovery documents revealed that money was taken from this fund and put into the recreation fund for the parks and rec surplus money was pulled out and paid over to another recreation project that the city had. This is profit motivated. We talked about hot dogs. You all talked about hot dogs. Well, that doesn't happen, but what does happen is the city engages in selling lemonade on the beach. But you keep your trailing off. It keeps your volume up. I'll try to do that. Thank you. My daughter worked for a company called Sunset Slush, and she pushed a cart up and down the streets when she was a teenager, and she sold lemonade and slushies, but not North Myrtle Beach. And North Myrtle Beach is prohibited. Only lemonade sold by the city. You can't sell slushies on the North Myrtle Beach? Not North Myrtle Beach. It's another one of these anti-competitive activities that is certainly not part of the  But that's what they do. This is a revenue-protecting, profit-motivated scheme by North Myrtle Beach, and as best we can tell from our inquiry, it's the only beach in South Carolina that does this. The others follow the statutory scheme and grant franchises, or they don't have it at all. But North Myrtle Beach is the only one we've found that engages in this proprietary conduct and is simply not the conduct that was protected by the Parker Immunity Doctrine. Now, let me suggest to you that- So I guess it's your position that they have a right to, I guess, contract with a private beach safety company, but they just can't do it themselves. I mean, if they have a right to do that, why can't they- I mean, they own the right to do it themselves, right? I think they can do it themselves. What they can't do is pass an amendment to their ordinances in 2022 to prohibit anybody else from doing it, unless they've granted it to a franchise. The city could certainly have that service, but making it exclusive to the city and not granting a franchise is a step too far under this statutory scheme, in our opinion. They certainly could compete with private enterprises if they chose to do that. They would have a decided advantage. But if they can exclusively grant it to a private company, why can't they exclusively grant it to themselves? That's not clearly articulated in this statute, and in our opinion, not reasonably perceivable under the language of this statute. It's obviously for the court to decide. But can't they- I think it's their position is that they can look at 5730 and 57- I'm asking 5730 and 57145 together, and then because of those two together, it gives them that right. Well, that's what their position is, and that's indeed what Judge Dawson did in the order, but that's not what any other opinion that I've read shows the analysis is supposed to be under the Parker Doctrine. And I need to touch for a moment on something that I haven't had a chance to. In the order, 514 was the ordinance that existed for years. It was passed pre-e-commerce. My client's business model was solely to take reservations and payment on the internet. Nothing in 514 envisioned that would happen, and so it was never conclusively determined that my client's business violated 514. It was admitted by Attorney Dorn in direct response to the court's question whether or not 514 prohibited the offending activity, and the admission was no, it doesn't expressly admit it, but it's always been our position. Well, even with that admission, that it doesn't expressly prohibit it, Judge Dawson's order found that it was prohibited by 514. I suggest to you that Judge Dawson may have started with the result he wanted and drafted the order accordingly. But we believe the analysis is flawed, and respectfully, we hope you will see that. Thank you very much, Mr. Moss. I thank both counsels for their fine arguments this morning.
judges: Albert Diaz, Roger L. Gregory, DeAndrea Gist Benjamin